COURT OF APPEALS
DECISION
DATED AND FILED

October 24, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. 2018AP1667-CR

Cir. Ct. No. 2016CM1408

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

ROSS HARRIS, JR.,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: DAVID T. FLANAGAN, III, Judge. *Affirmed*.

¶1    KLOPPENBURG, J.[1]  A jury found Ross Harris, Jr., not guilty of battery and guilty of disorderly conduct arising out of a physical altercation

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

between Harris and A.D. in a hospital elevator. Harris argues that the circuit court erroneously denied his motions for a mistrial based on three instances of what Harris asserted was improper testimony by two of the State's witnesses. I conclude that Harris fails to show that the court erroneously exercised its discretion and, therefore, I affirm.

## BACKGROUND

¶2 On the day in question, Harris and A.D. found themselves together in a hospital room visiting a newborn baby. Harris was the baby's paternal grandfather. Rachel Amos was the baby's maternal grandmother. Amos was engaged to A.D. Approximately one year earlier, Amos had broken up with A.D. and briefly dated Harris before returning to A.D. Harris and A.D. had not previously met each other, but A.D. knew that Amos had dated Harris.

¶3 After some communication back and forth between A.D. and Harris concerning A.D.'s belief that Harris possessed property belonging to Amos, Harris and A.D. left the room and entered the elevator. As the elevator descended from the third floor to the lobby, the altercation between A.D. and Harris took place.

¶4 As a result of the altercation, the State charged Harris with battery and disorderly conduct, both as a repeater. The case was tried before a jury. A.D. and Harris each testified at trial that the other initiated the altercation. Specifically, A.D. testified that Harris hit and punched him several times, and Harris testified that he only hit A.D. after A.D. swung at him and grabbed him and that they then hit each other several times, before the elevator doors opened and A.D. exited the elevator.

¶5    During trial, Harris made three motions for a mistrial based on three instances of what Harris asserted was improper testimony, comprising two statements by A.D. and one statement by Amos. The circuit court withheld ruling on the motions.

¶6    After the jury returned its verdict acquitting Harris of battery and convicting him of disorderly conduct, the circuit court denied Harris's mistrial motions. Harris appeals.

## DISCUSSION

¶7    The circuit court addressed all three mistrial motions after the jury returned its verdict. The court ruled as follows:

> I was concerned early on, but as the trial went along and as—particularly as closing arguments came in, which I thought were very reasonable on both sides—my concerns were satisfied. So I deny the motions for mistrial—each of the three of them.

¶8    "Whether to grant a mistrial is a decision that lies within the sound discretion of the circuit court." *State v. Doss*, 2008 WI 93, ¶69, 312 Wis. 2d 570, 754 N.W.2d 150. "The circuit court 'must determine, in light of the whole proceeding, whether the claimed error was sufficiently prejudicial to warrant a new trial. The denial of a motion for mistrial will be reversed only on a clear showing of an erroneous use of discretion' by the circuit court." *Id.* (citing *State v. Ross*, 2003 WI App 27, ¶47, 260 Wis. 2d 291, 659 N.W.2d 122). A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a rational process, reaches a conclusion that a reasonable judge could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982). This court will uphold the circuit court's exercise of

discretion if it can find facts of record that would support the court's decision. ***Peplinski v. Fobe's Roofing, Inc.***, 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995).

¶9 Consistent with these legal principles, I address in order the statements on which Harris based his mistrial motions.

### A.  A.D.'S USE OF THE WORD "STEAL"

¶10 Harris argues that the circuit court erroneously exercised its discretion in denying his mistrial motion based on A.D.'s use of the word "steal" in his testimony.  I first present the pertinent facts and testimony, and I then explain why I conclude that Harris fails to show that the court erroneously exercised its discretion in denying the motion.

### 1.  Pertinent Facts and Testimony

¶11 Before trial, Harris made a motion in limine relating to testimony about the genesis of the altercation.  Specifically, Harris explained to the circuit court that it appeared that the altercation took place after A.D. confronted Harris about A.D.'s belief that Harris possessed property belonging to Amos; Harris moved to preclude all of the State's witnesses and the prosecutor from telling the jury that Harris "committed a theft" with respect to that property.  The State responded that A.D. should be able to testify that he spoke to Harris about returning property that belonged to Amos without accusing Harris of having committed a theft or of stealing, in order to set the context for the incident.  The court agreed, explaining that the jury "should have some context for whatever happened" and that it understood that the State would not "be accusing Mr. Harris of having stolen something or taken something improperly."

¶12 A.D. testified in pertinent part as follows. After A.D. entered the hospital room, "I went to talk to [Harris] … I asked him if he wanted to go outside to talk about the stuff he had that belonged to [Amos] … I had money. I was going to try to get [Amos's] belongings … I told [Harris] it was wrong to steal from a lady. That, you know, she is a single mother and she works hard for her stuff."

¶13 Harris moved for a mistrial because A.D. had used the word "steal" after being told by the prosecutor not to use the words "theft" or "stolen." The circuit court withheld ruling on the motion.

¶14 Amos testified in pertinent part that she had sued in small claims court seeking return of certain items of property, but the court did not award her any items or money. Amos also testified about one item she no longer had, a laptop computer containing family photographs, but acknowledged that the laptop was not included in the items she listed in her small claims action.

¶15 Harris testified in pertinent part as follows. When A.D. and Amos entered the hospital room, A.D. demanded that he and Harris discuss Amos's missing items, and Harris told A.D. that Harris did not have any of Amos's items. A.D. sat next to Harris and repeated the same thing over and over again about the items and wanting to talk. When Harris and A.D. entered the elevator, A.D. asked "where is his stuff" and Harris said he did not have any property. Harris never withheld any items from Amos.

¶16 In closing arguments, the prosecutor told the jury that A.D. made a statement about the return of property, was pretty clear that he wanted to discuss this issue of property, and stated that he wanted to talk about buying the property back.

¶17   In closing, Harris's trial counsel told the jury as follows:

> There is absolutely no doubt that when [A.D.] entered the hospital room when Harris was there, that he started the confrontational behavior about this property. He's the one that began that discussion, the "I want my stuff we need to go talk about my stuff let's did [sic] outside we have to talk about this stuff. This stuff."
>
> There is also no doubt that [Amos] had already tried to recover whatever stuff this is through the police and was unsuccessful, had tried to recover either money or the property through the small claims court process and got nothing.
>
> And so when the other side says this is a happy day, there is no way that these people would be mad, they wouldn't start a disturbance—well, they already did, by bringing this property issue into this birth suite. And the people that did that—again zero question. [A.D.] Amos, but mostly [A.D.]
>
> ….
>
> They were starting it, they were upset about this property.

¶18   In rebuttal, the prosecutor told the jury, "It's pretty clear why [Amos] wanted property back—specifically her laptop computer. She told you that it had family photos she wanted." The prosecutor continued, "Sure, in a perfect world maybe [A.D.] would have addressed this at a different time or gotten a phone number or e-mail address or something like that. But that's not how it played out."

¶19   In addition to the remarks quoted at the start of this Discussion section, the circuit court in its ruling on Harris's mistrial motions stated:

> I was particularly concerned about the stealing and—but as it turned out, that whole question of bias was used by both sides, and I think pretty effectively by both sides. So to the extent there was any kind of a problem,

initially[,] I think it was largely dealt with by later testimony and argument on closing.

## 2. *Analysis*

¶20    Harris argues that the circuit court erroneously denied his mistrial motion because A.D.'s use of the word "steal" was improper "other acts" evidence showing that Harris was a bad person and also violated the court's ruling on motions in limine.[2]  Harris argues that this error was sufficiently prejudicial to warrant a new trial because the State's evidence against Harris was weak, making it more likely that the error improperly influenced the jury's conclusion.  The State responds that A.D.'s use of the word "steal" was not "other acts" evidence.  I need not resolve that issue because I conclude that Harris fails to show that the court erroneously exercised its discretion in determining that A.D.'s use of the word "steal" was not sufficiently prejudicial to warrant a new trial.

¶21    As reflected in the circuit court's ruling quoted above, the court did have concerns about A.D.'s use of the word "steal" early in the trial proceeding, but the court explained that those concerns disappeared given how the property issue was addressed in later testimony and the parties' closing arguments.  The court's reasoning is sufficiently supported by the record.  As presented above, all subsequent references to the property issue at trial were just that, references to A.D.'s and Amos's concerns about property that they believed belonged to Amos and that Harris denied taking, along with testimony about Amos's failed litigation

---

[2] More accurately, Harris argues on appeal that the offending testimony was "stealing from … a single mother."  However, Harris's argument in the circuit court was limited to A.D.'s use of the word "steal" after the circuit court prohibited the use of the words "theft" or "stolen."  Whatever additional force Harris means to attribute to A.D.'s reference to a single mother, his argument based on that reference is forfeited because he did not make that argument before the circuit court.  Regardless, it does not change the analysis that follows.

regarding her property. The court reasonably determined that any prejudice that may have attended A.D.'s testimony in which he once used the word "steal" was addressed by the parties and had dissipated as the subsequent testimony and closing arguments portrayed the property issue.

¶22    In sum, Harris fails to show that the circuit court unreasonably determined, in light of the whole trial, that the claimed error was not sufficiently prejudicial to warrant a new trial.

## B.  TESTIMONY THAT HARRIS MADE TWO STATEMENTS NOT DISCLOSED IN DISCOVERY

¶23    Harris argues that the circuit court erroneously exercised its discretion in denying his mistrial motions regarding other witnesses' testimony that Harris made the following two statements not disclosed in discovery: (1) A.D.'s testimony that, in the hospital room, some time after A.D. asked Harris to go outside and talk about Amos's property, Harris asked A.D. "if I was ready" and they went out to the hallway; and (2) Amos's testimony that, when Harris returned to the hospital room without A.D., Harris "told his son he had to leave before the cops came."  I first present the pertinent facts and testimony, and I then explain why I conclude that Harris fails to show that the court erroneously exercised its discretion in denying the motions.

### 1.  Pertinent Facts and Testimony

**A.D.'s Testimony:**

¶24    A police report produced in discovery included a record of an interview between an officer and A.D.  In pertinent part, the officer wrote the following in his report regarding the point in the interview when A.D. was

describing what took place after he entered the hospital room with Amos and saw Harris in the room:

> [A.D. told Harris] that they needed to talk about items that had been stolen from [A.D.'s] girlfriend, Amos. [A.D.] advised that Harris had said that "this is not the place;" however, that after approximately ten minutes that Harris had go [sic] discuss the issue regarding the property.

¶25 At trial, A.D. testified in pertinent part as follows. When he entered the hospital room and saw Harris there, he went to talk to Harris. He asked Harris if Harris "wanted to go outside to talk about the stuff he had that belonged to [Amos.]" A.D. wanted to go outside because "they just had the baby … I didn't want to bother nobody. But it was just—dumb. I thought it would be better to go outside and talk personal man-to-man. I mean, we are grown. That's what I figured. We were grown, we would just talk outside." A.D. was not asking Harris to go outside to fight; rather, A.D. "had money. I was going to try to get [Amos's] belongings." Harris responded that "he was visiting with his grandchild and his son, and we sat down." Everyone chatted and eventually Harris "asked me if I was ready, and we went out to the hallway."

¶26 Harris moved for a mistrial because the State did not disclose A.D.'s statement that Harris was the one who said he was "ready." The prosecutor noted that, given all of A.D.'s testimony about A.D. telling Harris that they should go outside to discuss the property, it could be inferred that Harris was saying only that he was ready to do so. The circuit court did not at that point agree with that inference, stated that it was "a really close call," and withheld ruling on the motion, which the court noted was the second mistrial motion at that point in the trial.

¶27    Harris testified in pertinent part as follows.  When A.D. entered the hospital room he acted "pretty hostile" towards Harris and tried to get Harris to go outside.

> [A.D.] came into the room demanding that we talk, and I said that this wasn't the time for that.  And he said that we needed to discuss the missing items that [Amos] had, and I told him that I didn't have any of her items and, like, basically leave me alone, this ain't the time for that. I'm not here to discuss that.

A.D. then pulled up a chair next to Harris and kept repeating the same things about wanting to talk to Harris about the property.  At some point Harris decided to go out for a smoke to get away from A.D. and Amos, let things simmer down, and defuse the situation so that "people would realize that we were here to see the baby and not discuss missing items."  When Harris left the room, A.D. followed Harris, making Harris feel very uncomfortable because A.D. had been trying to get Harris outside and maybe was intending to harm Harris.

¶28    In closing argument, the prosecutor told the jury that A.D. "was pretty clear that he wanted to discuss this issue of property."  Harris's trial counsel told the jury that, "The evidence is clear that [Harris] was the one taking the position [that] … this isn't the time or the place for this.  We are not talking about this today.  This is a happy day."

*Amos's Testimony:*

¶29    The police did not interview Amos.  A defense investigator's report produced in discovery included a record of an interview between the investigator and Amos.  In pertinent part, the report stated, regarding the point in the interview when Amos was describing what took place when Harris returned to the hospital

room without A.D.: "[Amos] said that [Harris] then hugged his son, Ross the third, said goodbye and left. [Amos] stated she then proceeded to look for [A.D.]"

¶30 At trial, Amos testified in pertinent part as follows. When Harris returned to the hospital room without A.D., he came running past out of breath and said that "your boyfriend is a bitch." She asked him why, and he said, "I kicked your boyfriend's ass and he called the cops." He then "told his son he had to leave before the cops—before the cops came," and left the room.

¶31 Harris moved for a mistrial because Amos's statement that Harris "told his son he had to leave before the cops came" was not disclosed to the defense. The prosecutor responded that it was the first time he heard the statement and that Harris could impeach Amos based on her failure to make that statement when interviewed by the investigator closer to the time of the incident. The circuit court stated that the statement was prejudicial to Harris but withheld ruling on the motion, which the court noted was the third mistrial motion at that point in the trial.

¶32 Harris testified in pertinent part as follows. When the elevator door opened A.D. jumped out and Harris remained in the elevator. Then the door closed, and Harris went back upstairs, grabbed a folder that he had brought there with him, and told his son that, "I'm sorry for what happened, but I have to leave." He never said he had to leave before the cops came, and he never told Amos that "I just kicked your boyfriend's ass and he's a little bitch" or anything like that. He left the hospital and walked to the bus stop.

¶33 In closing argument, Harris's trial counsel told the jury that when A.D. followed Harris to the elevator,

[Harris] would hope that [A.D.] would be a decent guy like he's being a decent guy and just there for the kids. Didn't turn out that way. And after the elevator when Mr. Harris decides I'm getting out of here, I'm going to go up I will say goodbye to my kid, and I'm going to get out of here.

Don't mean no trouble here. This isn't the place for this. They made that sound like he had to have started it, because he didn't say. I don't know that he would know that [A.D.] would have even called the police.[3]

What happened is Mr. Harris was hoping that it was going to be okay … I hope I can just go down and have my smoke.

But that's not the way it worked out. Instead he was attacked by [A.D.], who is angry about this property…. And Mr. Harris left. He went up the street a couple blocks to the bus stop.

¶34    In his rebuttal, the prosecutor told the jury that A.D. had testified that he was told after he exited the elevator that someone had called the police.

## 2. Analysis

¶35    Harris argues that the circuit court erroneously denied his mistrial motions because A.D.'s testimony that Harris asked A.D. "if I was ready" was not disclosed during discovery and Amos's testimony that Harris told his son "he had to leave … before the cops came" was not disclosed during discovery. Harris argues that both of these statements attributed to him prejudiced him because they suggested that he initiated the incident and then fled to avoid law enforcement.

¶36    The State responds that it did not commit any discovery violations with respect to these two statements. As with the first mistrial motion above, I

---

[3] A.D. testified that when he exited the elevator, he was told that a woman had called the police.

need not resolve that issue because I conclude that Harris fails to show that the circuit court erroneously exercised its discretion in determining that these two statements were not sufficiently prejudicial to warrant a new trial.

¶37 As with the first mistrial motion, the circuit court had concerns early in the trial, but the court explained that those concerns disappeared in light of later testimony and the parties' closing arguments. The court's reasoning is sufficiently supported by the record.

¶38 As presented above, regardless of whether or not Harris asked A.D. if he "was ready," it was undisputed that A.D. repeatedly told Harris that A.D. wanted them to go outside to discuss the property. Both A.D. and Harris so testified, and the prosecutor even acknowledged the force of A.D.'s intentions to go outside to discuss the property. Thus, the record supports the circuit court's implicit determination that any indication of provocation from Harris's asking if A.D. "was ready" was responded to by the defense and addressed by both parties in testimony and closing argument, and that any prejudice was weakened by the time of the conclusion of trial.

¶39 Similarly, the record supports the circuit court's implicit determination that Amos's testimony as to what Harris said about having to leave before the cops came was responded to by the defense and addressed by both parties in testimony and closing argument, and that any prejudice was weakened by Harris's testimony refuting Amos's version of events after Harris returned to the hospital room, Harris's trial counsel's closing remark suggesting the lack of evidence that Harris would have known that A.D. had called the police, and A.D.'s own testimony along with the prosecutor's statement in his rebuttal argument that A.D. was told that someone else had called the police after he exited the elevator.

¶40 In sum, Harris fails to show that the circuit court unreasonably determined that, in light of the whole trial, the claimed errors were not sufficiently prejudicial to warrant a new trial.

## CONCLUSION

¶41 For the reasons stated, Harris fails to show that the circuit court erroneously exercised its discretion in denying his mistrial motions. Accordingly, I affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.